**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

★   AUG 10 2006   ★

| | |
|---|---|
| CHARLES FEDERMAN, Derivatively on Behalf of Nominal Defendant, CA, INC. | Case No. **LONG ISLAND OFFICE** |
| Plaintiff, | **CV - 06  3880** |
| v. | **FEUERSTEIN, ⊃** |
| KENNETH D. CRON, ALFONSE M. D'AMATO, GARY J. FERNANDES, ROBERT E. LA BLANC, JAY W. LORSCH, WILLIAM E. MCCRACKEN, LEWIS S. RANIERI, WALTER P. SCHUETZE, JOHN A. SWAINSON,  LAURA S. UNGER, RON ZAMBONINI, RUSSELL M. ARTZT, WILLEM F.P. DE VOGEL, SHIRLEY STRUM KENNY, RICHARD A. GRASSO, and  ROEL PIEPER | **TOMLINSON, M** |
| Defendants, | |
| and | |
| CA, INC., | JURY TRIAL DEMANDED |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff, by his attorneys, submits this Verified Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE OF THE ACTION

1.     This is a shareholder's derivative action brought for the benefit of Nominal Defendant CA, Inc. ("CA" or the "Company") against certain current and former members of its Board of Directors (the "Board") seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment which have occurred from May 15, 2003 to the present (the "Relevant Period").

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 in that this Complaint states a federal question. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

3.      Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district. One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

4.      Plaintiff Charles Federman is, and was at all relevant times, a shareholder of Nominal Defendant CA.

5.      Nominal Defendant CA is a Delaware corporation with its principal executive offices located at One Computer Associates Plaza, Islandia, NY 11749. CA markets itself as one of the world's largest information technology management software companies. The Company was originally known as Computer Associates, Inc.

6.      Defendant Kenneth D. Cron ("Cron") was Interim CEO of the Company from April 2004 to February 2005. He has been a member of the Board of Directors of the Company since 2002.

7.      Defendant Alfonse M. D'Amato ("D'Amato") has been a member of the Board of Directors of the Company since 1999.  He is a member of the Board's Audit Committee.

8.      Defendant Gary J. Fernandes ("Fernandes") has been a member of the Board of Directors of the Company since 2003.

9.      Defendant Robert E. La Blanc ("La Blanc") has been a member of the Board of Directors of the Company since 2002.  He is a member of the Board's Audit Committee.

10.     Defendant Jay W. Lorsch ("Lorsch") has been a member of the Board of Directors of the Company since 2002.

11.     Defendant William E. McCracken ("McCracken") has been a member of the Board of Directors of the Company since 2005.

12.     Defendant Lewis S. Ranieri ("Ranieri") has been a member of the Board of Directors of the Company since 2001.

13.     Defendant Walter P. Schuetze ("Schuetze") has been a member of the Board of Directors of the Company since 2002.  He is a member of the Board's Audit Committee.

14.     Defendant John A. Swainson ("Swainson") has been a member of the Board of Directors of the Company since 2004.  He is currently the Company's CEO and President.

15.     Defendant Laura S. Unger ("Unger") has been a member of the Board of Directors of the Company since 2004.  She is a member of the Board's Audit Committee.

I:\Pending\CA\Complaint.doc

16.      Defendant Ron Zambonini ("Zambonini") has been a member of the Board
of Directors of the Company since 2005.

17.      Defendant Russell M. Artzt ("Artzt") served as a director of CA from 1980
until August 2005.  He is also the Executive Vice President-Research and Development
and the former Senior Development Officer of the Company.

18.      Defendant Willem F.P. de Vogel ("de Vogel") served as a director of CA
from 1991 until August 2002.  He was a member of the Company's Audit Committee
and Stock Option and Compensation Committee.

19.      Defendant Shirley Strum Kenny ("Kenny") served as a director of CA from
1994 until August 2002.  She was a member of the Company's Audit Committee.

20.      Defendant Richard A. Grasso ("Grasso") served as a director of CA from
1994 until August 2002.  He was a member of the Company's Stock Option and
Compensation Committee.

21.      Defendant Roel Pieper ("Pieper") served as a director of CA from 1999
until August 2002.   He was a member of the Company's Stock Option and
Compensation Committee.

22.      Collectively, the Defendants are referred to herein as the "Individual
Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

23.      By reason of their positions as officers and/or directors of the Company
and because of their ability to control the business and corporate affairs of the
Company, the Individual Defendants owed the Company and its shareholders the
fiduciary obligations of good faith, trust, loyalty, and due care, and were and are

required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

24.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

25.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

   a.   exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

   b.   exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

   c.   exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial

statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); and

  e. refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

26. The Individual Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Individual Defendants were required to:

  a. make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

  b. devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

    (1) transactions are executed in accordance with management's general or specific authorization;

    (2) transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

## FACTUAL ALLEGATIONS

27. At all times relevant hereto the Compensation Committee (which consisted of Defendants de Vogel, Grasso and Pieper) approved grants under and supervised the administration of the Company's stock option plans.

28.     On July 31, 2006, CA issued a press release entitled "CA Files Annual Report on Form 10-K for Fiscal Year 2006." The press release disclosed that the Company had discovered that, prior to 2002, the Compensation Committee of the Board of Directors had approved pools of options to, primarily, non-executive employees. The fact that these individuals had received these grants was not communicated to the recipients until up to two years after the approval of the options. Furthermore, the press release disclosed that, in almost all cases, the exercise price set at the time of the approval was lower than the market price on the date the grant was communicated to the recipients.

29.     The Form 8-K filed by the Company in July 31, 2006, disclosed that the Company had previously treated the date of approval of the options as the accounting measurement date for determining stock-based compensation expense. Upon review, the Company determined that the proper accounting measurement date should have been the date the grant was communicated to the recipient.

30.     As a result, the Form 10-K for the fiscal year 2005, filed on July 31, 2006, reflected a restatement for fiscal years 1996 through 2006 to reflect the increase in non-cash stock based compensation expense. The restatement increased after-tax, non-cash based compensation in fiscal years 2002, 2003 and 2004 by \$50 million, \$30 million and \$16 million, respectively.

31.     The July 31, 2006 press release also announced that the 2005 Form 10-K reflected adjustments to restate subscription revenue as a result of the Company's review of license agreements. The subscription revenue in Fiscal Years 2004 and 2005 was increased by \$12 million and \$43 million, respectively.

32.     The July 31, 2006 Form 8-K disclosed that the Form 10-K also contained a restatement to reflect sales commission expense that should have been recorded in the fiscal quarter ended December 31, 2005.

33.     The July 31, 2006 press release further disclosed that the Company had "identified several Sarbanes-Oxley 404 material weaknesses, including two material weaknesses in connection with [the] restatements," and that "in light of the restatements included in the Form 10-K ... CA's previously issued financial statements for its 2005 through 2002 fiscal years and the quarterly reports included in the 2006 through 2002 fiscal years should no longer be relied upon."

34.     The Form 10-K filed on July 31, 2006 stated, as follows:

In this Form 10-K, we are restating prior fiscal periods principally to reflect additional (a) non-cash stock-based compensation expense relating to employee stock option grants prior to fiscal year 2002, (b) subscription revenue relating to the early renewal of certain contracts, and (c) sales commission expense that should have been recorded in the third quarter of fiscal year 2006, as described below. As a result of these restatements and the issues discussed below, the Company delayed the filing of the Form 10-K for fiscal year 2006 beyond its extended due date of June 29, 2006.

*     *     *

The Company also reported material weaknesses in its financial controls as they relate to the determination of a grant date for stock options prior to fiscal year 2002, revenue recognition for early renewal of certain license agreements, and the estimation, recording and monitoring of sales commissions. ...

Stock Options:

Given the stock option issues facing public companies, particularly in the technology sector, the Company conducted an internal review, with the assistance of outside consultants, into its historical policies and procedures with respect to the granting of stock options, principally from fiscal year 1996 to the present under its stock option plans in effect during this period. Based upon the results of our review, we determined that in years prior to fiscal year 2002, we did not communicate stock option

grants to individual employees in a timely manner. In fiscal years 1996 through 2001, the Company had delays of up to approximately two years from the date that employee stock options were approved by the committee of the Company's Board of Directors charged with such duties (the "Committee"), to the date such stock option grants were communicated to individual employees.

Prior to fiscal year 2002, the Committee generally approved grants to executives and other employees receiving options, the terms of which were generally set on the date that the Committee acted, including the exercise price, vesting schedule and term. However, in a number of cases, these approvals involved pools of options that were not allocated to specific individuals at the time of such approvals. It also appears that communication of these grants by management to individual employees was not made until some time after the Committee acted, including in some cases up to two years after such Committee action. In almost all cases, this earlier date had an exercise price that was lower than the market price of the Company's common stock on the date the award was formally communicated to employees. The grants which were not communicated on a timely basis were made primarily to non-executive employees and this grant practice was changed after fiscal year 2001. The current practice is that a grant is communicated promptly after it is approved by the Committee.

The Company treated the date of the action by the Committee as the accounting measurement date for determining stock-based compensation expense. However, the Company has determined that the proper accounting measurement date for stock option awards that were not communicated timely to an employee, should have been the date the grant was communicated to an employee, not the date the Committee approved the grant.

*       *       *

*Subscription Revenue:*

Based upon the Company's review of certain software license contract renewals principally in prior periods, the Company has determined that it has understated subscription revenue recorded in prior periods and as a result will restate its results for fiscal years 2005 and 2004 and for the interim periods of fiscal years 2006 and 2005. This restatement reflects a further adjustment to subscription revenue amounts previously restated in the Company's Annual Report on Form 10-K/A for the fiscal year ended March 31, 2005 and filed with the Securities and Exchange Commission (the "SEC") on October 18, 2005.

I:\Pending\CA\Complaint.doc

As discussed further in this Form 10-K, the Company recognizes revenue ratably on a monthly basis over the term of the respective subscription license agreements. When a contract is cancelled and renewed prior to the expiration of its term, the Company recognizes all future revenue for the arrangement ratably over the new license term. The Company determined that, beginning in fiscal year 2004, it had been systematically understating revenue for certain license agreements which have been cancelled and renewed more than once prior to the expiration of each successive license agreement. This restatement resulted in an increase in subscription revenue of approximately $43 million and $12 million in fiscal years 2005 and 2004, respectively, and approximately $19 million in the first three quarters of fiscal year 2006.

*Restatement of Third Quarter Fiscal Year 2006 Results:*

In this Form 10-K we have restated financial results for the third quarter of fiscal year 2006 to reflect approximately $31 million of additional commission expense that should have been recorded in that period. This restatement does not affect previously reported cash flows from operations or financial results for the full fiscal year. Refer to Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations — Results of Operations — Commissions, Royalties and Bonuses", and Item 9A, "Controls and Procedures", for additional information.

Additionally, while not related to this commission expense restatement, the Company also identified approximately $14 million in income taxes recorded in the third quarter of fiscal year 2006 associated with foreign taxable income from prior fiscal years. Since we are restating the results for the third quarter of fiscal year 2006, as well as prior fiscal periods, we have determined that this charge should properly be reflected in the periods to which it related. Accordingly, an adjustment is also being made to decrease income taxes in the third quarter of fiscal year 2006 by approximately $14 million and increase income tax expense primarily in fiscal years 2003 and 2002 by approximately $2 million and $12 million, respectively.

35.     The Form 10-K further stated, as regards to the Company's material

weakness in internal control:

Management has conducted its evaluation of the effectiveness of internal control over financial reporting as of March 31, 2006 based on the framework in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Management's assessment included an evaluation of the design of the Company's internal control over financial reporting and testing the

effectiveness of the Company's internal control over financial reporting. During this evaluation, management identified material weaknesses in the Company's internal control over financial reporting, as described below. Management has concluded that as a result of these material weaknesses, as of March 31, 2006, the Company's internal control over financial reporting was not effective based upon the criteria in *Internal Control — Integrated Framework* issued by COSO.

A material weakness is a control deficiency, or a combination of control deficiencies, that result in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. Management has identified the following material weaknesses as of March 31, 2006:

    (i)    The Company did not maintain an effective control environment due to a lack of effective communication policies and procedures. Specifically, (a) there was a lack of coordination and communication among certain of the Company's senior executives with responsibility for the sales and finance functions and within the sales and finance functions regarding potentially significant financial information; and (b) there were communications by certain senior executives that failed to set a proper tone, which could discourage escalation of information of possible importance in clarifying or resolving financial issues. These deficiencies resulted in more than a remote likelihood that a material misstatement of the annual or interim financial statements would not be prevented or detected and contributed to the material weaknesses in internal controls described in items (ii) and (iii) below.

    (ii)    The Company's policies and procedures relating to controls over the accounting for sales commissions were not effective. Specifically, the Company did not effectively estimate, record and monitor its sales commissions and related accruals. The Company also did not reconcile its commission expense accrual to actual payments on a timely basis. These deficiencies resulted in a material error in the recognition of commission expense, which resulted in a restatement of the interim financial statements for the three and nine-month periods ended December 31, 2005.

    (iii)    The Company's policies and procedures relating to the identification, analysis and documentation of non-routine tax matters were not effective. The Company's tax function also did not provide timely communication to management of its assumptions regarding certain non-routine tax matters. This deficiency resulted in a material error in the recognition of taxes

associated with the Company's cash repatriation, which occurred in the fourth quarter of fiscal year 2006.

(iv)  The Company's policies and procedures relating to the accounting for and disclosure of stock-based compensation relating to stock options were not effective. Specifically, controls including monitoring controls, were not effective in ensuring the existence, completeness, valuation and presentation of the Company's granting of stock options, which impacted the Company's determination of the fair value associated with these awards and recognition of stock-based compensation expense over the related vesting periods from fiscal year 2002 through fiscal year 2006. This deficiency resulted in material errors in the recognition of compensation expense, additional paid-in capital, deferred taxes and related financial disclosures relating to such stock options, which contributed to a restatement of annual financial statements for fiscal years 2005 through 2002, and for interim financial statements for fiscal years 2006 and 2005.

(v)  The Company's policies and procedures were not effectively designed to identify, quantify and record the impact on subscription revenue when license agreements have been cancelled and renewed more than once prior to the expiration date of each successive license agreement. This deficiency resulted in material errors in the recognition of revenue, which contributed to a restatement of annual financial statements for fiscal years 2005 and 2004, and for interim financial statements for fiscal years 2006 and 2005.

Each of the aforementioned material weaknesses in internal control over financial reporting individually resulted in more than a remote likelihood that a material misstatement of the Company's interim or annual financial statements would not have been prevented or detected.

\*       \*       \*

The Company's independent registered public accountants, KPMG LLP, have audited and issued a report on management's assessment of the Company's internal control over financial reporting. That report is included on the page set forth in the List of Consolidated Financial Statements and Financial Statement Schedules.

### Dissemination of False Financial Statements

36.    As a result of the improper accounting for the stock options, the Company,

with the knowledge, approval, and participation of each of the Individual Defendants,

a.   violated the terms of the Company's shareholder-approved stock
option plans;

b.   violated GAAP by failing to recognize compensation expenses
incurred when the options were granted;

c.   produced and disseminated to CA shareholders and the market
false financial statements that improperly recorded and accounted
for the option grants.

37.    The Company, with the knowledge, approval, and participation of each of

the Individual Defendants, disseminated its false financial statements in, *inter alia*, the

Company's Form 10-K filings and Proxy Statements for the fiscal years 1996 through

2005.

## THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

38.    The Individual Defendants breached their fiduciary duties by:

a.   colluding to fail to timely communicate stock option grants;

b.   colluding to violate GAAP;

c.   colluding to produce and disseminate to CA shareholders and the
market false financial statements that improperly recorded and
accounted for the option grants;

d.   failing to maintain adequate internal controls, leading to the
current restatements; and

e.   allowing material misstatements to be disseminated in the
Company's Proxy Statements.

39.    The Individual Defendants' foregoing misconduct was not, and could not

have been, an exercise of good faith business judgment.  Rather, it was intended to,

and did, unduly benefit the Individual Defendants at the expense of the Company.

40.    As a direct and proximate result of the Individual Defendants' foregoing

breaches of fiduciary duties, the Company has sustained millions of dollars in damages,

including, but not limited to, the additional compensation expenses and tax liabilities the

Company was required to incur, loss of funds paid to the Company upon exercise of options, and costs and expenses incurred connection with the Company's restatement of historical financial statements.

## DEMAND WOULD BE FUTILE

41. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress defendants' breaches of fiduciary duties and unjust enrichment.

42. Plaintiff is an owner of CA common stock and was an owner of CA common stock at all times relevant hereto.

43. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

44. As a result of the facts set forth herein, plaintiff has not made any demand on the CA Board of Directors to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

45. The Board currently consists of eleven directors: Defendants Cron, D'Amato, Fernandes, La Blanc, Lorsch, McCracken, Ranieri, Schuetze, Swainson, Unger and Zambonini. The following directors are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action:

    a. D'Amato, because he was a member of the Board of Directors during the time in which the stock options at issue were granted. As such, he directly participated in and approved the misconduct alleged herein and is substantially likely to be held liable for breaching his fiduciary duties, as alleged herein. Accordingly, D'Amato is incapable of independently and disinterestedly

considering a demand to commence and vigorously prosecute this action against himself and the other defendants.

b.   Cron, because, as the interim CEO of the Company from April 2004 through February 2005, during a time period in which the Company's financials have been restated, he directly participated in and approved the misconduct alleged herein and is substantially likely to be held liable for breaching his fiduciary duties, as alleged herein.   Accordingly, Cron is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against himself and the other defendants.

c.   Swainson, because, as the CEO of the Company from February 2005 to the present, during a time period in which the Company's financials have been restated, he directly participated in and approved the misconduct alleged herein and is substantially likely to be held liable for breaching his fiduciary duties, as alleged herein.   Accordingly, Cron is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against himself and the other defendants.

d.   D'Amato, La Blanc, Schuetze and Unger, because, as members of the Board's Audit Committee, they oversaw the internal controls of the Company.   Accordingly, D'Amato, La Blanc, Schuetze and Unger are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against themselves and the other defendants.

e.   Making demand on such a number of shareholders would be impossible for Plaintiff, who has no way of finding out the names, addresses or phone numbers of all the shareholders.

f.   Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

g.   The acts complained of constitute violations of the fiduciary duties owned by CA's officer and directors and these acts are incapable of ratification.

46.   Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment.

## FIRST CAUSE OF ACTION
### Against The Individual Defendants
### <u>For Breach Of Fiduciary Duty</u>

47.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

48.     As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

49.     As alleged in detail herein, the Individual Defendants breached their fiduciary duties by:

    a.      colluding to fail to timely communicate stock option grants;

    b.      colluding to violate GAAP;

    c.      colluding to produce and disseminate to CA shareholders and the market false financial statements that improperly recorded and accounted for the option grants; and

    d.      failing to maintain adequate internal controls, leading to the current restatements.

50.     The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.   Rather, it was intended to, and did, unduly benefit them at the expense of the Company.

51.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company was required to incur, loss of funds paid to the Company upon exercise of

I:\Pending\CA\Complaint.doc

options, costs and expenses incurred connection with the Company's restatement of historical financial statements.

## SECOND CAUSE OF ACTION

### Against The Individual Defendants
### for Abuse of Control

52.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

53.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence CA, for which they are legally responsible.

54.     As a direct and proximate result of the Individual Defendants' abuse of control, CA has sustained significant damages.

55.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

56.     Plaintiff, on behalf of CA, has no adequate remedy at law.

## THIRD CAUSE OF ACTION

### Against The Individual Defendants
### for Gross Mismanagement

57.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

58.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of CA in a manner consistent with the operations of a publicly held corporation.

I:\Pending\CA\Complaint.doc

59.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, CA has sustained significant damages in excess of millions of dollars.

60.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

61.    Plaintiff, on behalf of CA, has no adequate remedy at law.

## FOURTH CAUSE OF ACTION

### Against The Individual Defendants
### for Waste of Corporate Assets

62.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

63.    As a result of the Individual Defendants' improper conduct and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, Individual Defendants have caused CA to waste valuable corporate assets by paying bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

64.    As a result of the waste of corporate assets, Individual Defendants are liable to the Company.

65.    Plaintiff, on behalf of CA, has no adequate remedy at law.

18                                                      I:\Pending\CA\Complaint.doc

## FIFTH CAUSE OF ACTION

### Against the Individual Defendants for Violations of
### Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder

66.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

67.     The Individual Defendants caused CA to file Proxy Statements with the SEC on July 21, 2003, July 29, 2004 and July 26, 2005 (the "Proxy Statements"). The Proxy Statements, which were circulated to CA's shareholders, sought shareholder approval for, among other things, the reelection of the following individuals to CA's board of directors: Defendants D'Amato, Fernandes, La Blanc, Lorsch, McCracken, Ranieri, Schuetze, Swainson Unger, Zambonini and Artzt.

68.     In the Proxy Statement, in an effort to induce CA's shareholders to vote for, among other things, the reelection of the directors listed above, the Individual Defendants omitted disclosures relating to the Company's improperly accounting for option grants and the failure to maintain adequate internal controls.

69.     The Proxy Statement was materially false and misleading in that the Director Defendants were aware, or should have been aware, but did not disclose that:

> a.     the Individual Defendants had failed to timely communicate stock option grants;
>
> b.     that the Company's financial statements violated GAAP;
>
> c.     that the financial statements improperly recorded and accounted for the option grants; and
>
> d.     that there was a failure to maintain adequate internal controls, leading to the current restatements.

70.     The misstatements and omissions alleged above were material. Had the truth been disclosed, CA's shareholders may well have elected different directors to

CA's board. The Defendants should have known that the Proxy Statements contained misstatements and omissions as alleged above.

71.   CA has been injured by the material misstatements in and omissions from the Proxy Statements. CA has no adequate remedy at law and is therefore entitled to equitable relief including, without limitation, an order setting aside the election of defendants D'Amato, Fernandes, La Blanc, Lorsch, McCracken, Ranieri, Schuetze, Swainson Unger, and Zambonini pursuant to the Proxy Statements. Further, CA is entitled to recover damages to compensate the Company for all damages resulting from the Individual Defendants' acts and omissions in violation of Rule 14a-9.

72.   This action was timely commenced within three years of the date of the Proxy Statements and within one year from the time plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based.

WHEREFORE, Plaintiff demands judgment as follows:

A.   Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.   Granting appropriate equitable relief to remedy Defendants' breaches of fiduciary duties;

C.   Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

D.   Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

Respectfully Submitted,

WILLIAM B. FEDERMAN, WF9124
FEDERMAN & SHERWOOD
120 N. Robinson, Suite 2720
Oklahoma City, OK 73102
Phone: (405) 235-1560
Fax: (405) 239-2112
wfederman@aol.com

and

2926 Maple Avenue, Suite 200
Dallas, TX 75201

**VERIFICATION**

I, _____ declare that I have reviewed the Complaint ("Complaint") prepared on behalf of CA, INC. [NYSE: CA], and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of CA, INC. [NYSE: CA] common stock during the time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

8/8/2006
Date

_____
(Signature of Investor)